## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

MICHELLE G. PORTA,

       Plaintiff,

v.                                    Civ. No. 11-01138 MV/LAM

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion for Summary Judgment and Brief [Doc. 21] and Defendant's Motion for Summary Judgment and Supporting Memorandum [Doc. 22].   The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that Plaintiff's Motion for Summary Judgment is not well taken and will be denied and that Defendant's Motion for Summary Judgment is well taken and will be granted.

## BACKGROUND[1]

Plaintiff, a federal employee assigned to the Office of the Chief Counsel, Border Patrol Academy, Artesia, New Mexico, filed a Complaint alleging that she was denied health insurance benefits in violation of the Federal Employees' Health Benefits Act of 1959 ("FEHBA"), 5 U.S.C. § 8901 *et seq.*   Plaintiff alleges that Blue Cross Blue Shield of Arizona ("BCBSAZ") wrongfully denied her claims for health benefits and that the Office of Personnel Management ("OPM") erred when it affirmed BCBSAZ's denial.   Plaintiff asks the Court to "direct the Defendant [OPM] to

---

[1]   The following facts are undisputed.

1

issue [an] order to the carrier . . . to pay all the medical costs plaintiff incurred . . . in 2008 and 2009."   These medical expenses exceed $200,000.

In 2008 and 2009, Plaintiff was enrolled in the Standard Option of the Blue Cross and Blue Shield Service Benefit Plan for federal employees under contract CS 1039 (the "Plan").   The brochure for the Plan, which is entitled "Blue Cross and Blue Shield Service Benefit Plan" (the "Plan Brochure"), constitutes the official statement of benefits available under the Plan.   In 2008 and 2009, the Plan Brochure was substantially the same in portions relevant to this suit.

The Plan is a fee-for service plan that allows enrollees to choose their own physicians, hospitals, and other health care providers.   *See* 2008 Plan Brochure, Compl. Exh. 8 [Doc. 1-19] ("Exh. 8"), p. 6; 2009 Plan Brochure, Compl. Exh. 9 [Doc. 1-24] ("Exh. 9"), p. 6.   The Plan offers services through a Preferred Provider Organization ("PPO"), which means that certain hospitals and other health care professionals are "Preferred Providers" (also referred to herein as "PPO Providers" or providers who are "Preferred") because they have entered into contracts with the Local Plan covering the area in which they practice.   *See id.*; Exh. 8, p. 6.   When enrollees use Preferred Providers, they receive covered services at a reduced cost ("PPO Benefits"), which is less than the cost of using medical professionals or facilities that are not Preferred.   *See id.*; Exh. 9, p. 6.   The Plan Brochure explains why the cost is reduced:   "PPO (Preferred) providers have agreed to accept a specific negotiated amount [*i.e.*, the "Plan allowance"] as payment in full for covered services provided to you," and thus "[y]our out-of-pocket costs . . . are limited to your coinsurance or copayments (and, under Standard Option only, the applicable deductible)."   *Id.*; Exh. 8, p. 6 (a Preferred Provider "will accept 100% of the Plan allowance as payment in full for covered services").

If enrollees choose to use a medical professional or facility that is not Preferred ("Non-PPO Provider"), they receive covered services at a higher cost than they would if the professional was a Preferred Provider ("Non-PPO Benefits").   The Plan Brochure explains, "Providers who are not Preferred . . . providers do not have contracts with us, and may or may not accept our allowance" for a particular service.   *Id.*; Exh. 9, p. 7.   Thus, if the provider's service charge exceeds the Plan's allowance, enrollees must pay the difference between the amount charged by the Non-PPO Provider and the Plan's allowance.   *See id.*; Exh. 8, p. 7.   In addition, the enrollee must pay any applicable coinsurance, copayments, and payments towards the calendar year deductible.   *See id.*; Exh. 9, p. 7.   The Plan Brochure notes in bold:   "Important:   Under Standard Option, your out-of-pocket costs may be substantially higher when you use [Non-PPO P]roviders than when you use Preferred . . . providers."   *Id.*; Exh. 8, p. 7.

A "Local Plan . . . is solely responsible for the selection of PPO Providers" in any given area.   *Id.*, p. 6; Exh. 9, p. 6.   The Plan Brochure explains that "[e]ach Local Plan contracts with hospitals and other health care facilities, physicians, and other health care professionals in its service area, and is responsible for processing and paying claims for services you receive within that area."   *Id.*; Exh. 8, p. 6.

In April 2008, Plaintiff began receiving treatment for lung cancer.   Plaintiff elected to receive treatment at the Mayo Clinic in Phoenix, Arizona ("Mayo Clinic AZ") for surgery, chemotherapy, radiation, and follow-up visits.   The Mayo Clinic AZ is not a member of the Plan's PPO and therefore is not Preferred.   As a result of Plaintiff's election to receive treatment at the Mayo Clinic AZ—a Non-PPO Provider—Plaintiff incurred over $200,000 in medical bills for which she is personally responsible.

3

On June 22, 2008, Plaintiff sent a letter to the Plan requesting that it review benefit claims for services received between April 23, 2008, and May 19, 2008 ("2008 Claims").   Plaintiff argued that the "catastrophic coverage protection amount of $6,500 for both preferred and non-preferred providers was met," and that the Plan was "responsible for 100% of any subsequent/additional charges from the Mayo Clinic [AZ] after that amount was reached."   On August 12, 2008, the carrier denied Plaintiff's request to forward full payment to the Mayo Clinic AZ.   The carrier explained, "The claims have been processed according to the Plan allowance. Services cannot be processed in full nor can the Plan forward the payments to the Mayo Clinic. When you use Non-[PPO P]roviders, we will then pay our benefits to you, and you must pay the provider."   Appendix vol. 1, pt. 2 [Doc. 18-2], p. 3.   The carrier further indicated, "The providers [from which you sought treatment] are not currently contracted with our Plan for these services. Consequently, they are under no obligation to accept our payment as payment in full."   *Id.*, p. 4. The carrier explained that the difference between the Plan's allowance and any given Non-PPO Provider's billed amount was Plaintiff's responsibility and suggested that Plaintiff "attempt to negotiate an acceptable allowance with [each of the providers]."   *Id.*

On December 22, 2008, Plaintiff filed an appeal with Defendant OPM challenging the BCBSAZ's denial of benefits for her 2008 Claims, raising only the argument that she was entitled to full payment of her claims under the Plan's catastrophic protection.   On February 25, 2009, Defendant OPM issued a denial letter concurring with the carrier's decision to deny benefits for these claims.   In its letter, Defendant OPM explained that pursuant to the Plan Brochure, Plaintiff was required to pay "25% of the Plan allowance, plus any difference between [the] allowance and the billed amounts" because the Mayo Clinic AZ was not Preferred.   Appendix vol. 1, pt. 1 [Doc. 18-1], p.1.   Defendant OPM further concluded that the carrier had "paid the claim at the highest

4

level possible," "that Non-[PPO P]roviders are not contracted with the Plan and can bill for the difference between the Plan's allowance and the amount charged," and that "Non-[PPO P]roviders are under no obligation to accept the Plan's allowance as payment in full."   *Id*.

Plaintiff subsequently filed additional claims for benefits with the carrier.   The second claim involved benefits for care received on September 25, 2009; the third claim was based on benefits for care received June 12, 2008, through December 31, 2009 (collectively referred to herein as Plaintiff's "2008 and 2009 Claims").   These claims were denied by the carrier on or before May 27, 2009.   On December 9, 2009, more than six months after the carrier denied her 2008 and 2009 Claims, Plaintiff filed a request that the carrier reconsider its decision.

On January 22, 2010, the carrier affirmed its denial of Plaintiff's 2008 and 2009 Claims. On October 24, 2011, more than 90 days after the carrier's decision, Plaintiff submitted a request that OPM review the carrier's denial of claims for all services received from May 2008 through December 2009.   Defendant OPM did not respond to this request.

## **STANDARD**

### I.   Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).   Under Rule 56(c), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).   Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

of summary judgment." *Id*. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted). The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted). The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co*., 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g*., *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

II.    Judicial Review under the Administrative Procedure Act

The decisions of OPM on disputed health benefits claims are subject to judicial review pursuant to the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*. *See*

6

*Bryan v. Office of Personnel Mgmt.*, 165 F.3d 1315, 1318-19 (10th Cir. 1999) (citations omitted). "Under the Administrative Procedure Act, the court must afford considerable deference to OPM's findings and set aside an OPM action only if it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Phillips Petroleum Co. v. U.S. Environmental Protection Agency*, 803 F.2d 545, 558 (10th Cir. 1986) (quoting 5 U.S.C. § 706(2)(A)). "'To make [an arbitrary and capricious] finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). When reviewing an agency's action, the court's "task is to ensure the agency examined the relevant data and articulated a rational connection between that data and its decision." *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1182-83 (10th Cir. 2013) (citations omitted); *accord Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008). "'Although this inquiry into the facts is to be searching and careful, the ultimate standard is a narrow one. The court is not empowered to substitute its judgment for that of the agency.'" *Phillips*, 803 F.3d at 558 (quoting *Overton Park*, 401 U.S. at 416).

## DISCUSSION

The parties have filed cross-motions seeking summary judgment in their favor on the claims set forth in the Complaint. As a threshold procedural matter, the parties dispute whether Plaintiff properly exhausted her administrative remedies with respect to her 2008 and 2009 Claims. Defendant argues that Plaintiff's 2008 and 2009 Claims are "time barred" because she failed to seek reconsideration from the carrier within six months of the original denial and because she failed to obtain a final decision from OPM within 90 days of the carrier's final denial. Plaintiff argues that OPM's exhaustion requirements are non-jurisdictional and that the Court has

7

discretion to excuse any defects.   In addition to disputing the timeliness of Plaintiff's requests for administrative review, the parties also dispute whether the APA's deferential standard of review applies or whether the Court should review OPM's decision de novo.

With respect to the merits of the cross-motions for summary judgment, Plaintiff argues that the Court should grant summary judgment in her favor and require Defendant OPM to order BCBSAZ to pay Plaintiff's claims because she was protected by the "medically underserved" provision set forth in Section 8902(m)(2) of FEHBA.   Plaintiff further argues that she is entitled to summary judgment because the Plan Brochure misled her and because she met the catastrophic coverage threshold in the Brochure.   Defendant contends that the Court should sustain Defendant OPM's decision to affirm BCBSAZ's denial of benefits because OPM drew a rational connection between the evidence and its decision therefore was not arbitrary, capricious, or an abuse of discretion.

The Court first will provide an overview of FEHBA and Defendant OPM's role in administering the Act.   Thereafter, the Court will address the parties' procedural and substantive arguments in turn.

I.      FEHBA and OPM's Administrative Role

Plaintiff brings her Complaint against Defendant OPM pursuant to FEHBA, which regulates health benefits for federal employees by establishing qualifications for carriers and requiring certain types of benefits, levels, and rates.   *See* 5 U.S.C. §§ 8902, 8903.   Defendant OPM is responsible for "executing, administering and enforcing . . . the civil service rules and regulations of the President and [OPM] and the laws governing the civil service."   5 U.S.C. § 1103(a)(5)(A).   OPM's duties include the administration and enforcement of the rules and

regulations under FEHBA.   *See* 5 U.S.C. §§ 8902, 8913; *see also Weight Loss Healthcare Centers of Am., Inc. v. Office of Personnel Mgmt.*, 655 F.3d 1202, 1205 (10th Cir. 2011).

Under FEHBA, OPM may enter into contracts with health insurance carriers to provide coverage for federal employees, *see* 5 U.S.C. § 8902(a), prescribe minimum standards for health insurance plans, *see id.* § 8902(e), and determine whether rates charged by the plans "reasonably and equitably reflect the cost of the benefits provided," *id.* § 8902(i).   FEHBA also authorizes OPM to promulgate regulations to carry out the Act's provisions.   *See id.* § 8913(a); *Weight Loss Healthcare*, 655 F.3d at 1205.   OPM regulations set minimum standards for insurers, permit OPM to withdraw approval of insurance plans not meeting its standards, and authorize OPM to negotiate benefit and premium changes with health insurance carriers.   *See id.* at 1205-06 (citing 5 C.F.R. §§ 890.202, 890.204, 890.203(b)).

FEHBA requires any carrier contracting with OPM to pay for or provide services if OPM finds that the employee is so entitled.   *See* 5 U.S.C. § 8902(j); *see also Weight Loss Healthcare*, 655 F.3d at 1205.   To implement this statutory provision, OPM has established an administrative procedure for resolution of benefit claims disputes between FEHBA carriers and plan enrollees. *See* 5 C.F.R. § 890.105.

Pursuant to these procedures, if an enrollee disputes a carrier's resolution of a claim, the enrollee must first seek reconsideration from the carrier within six months of the original denial. *See* 105 C.F.R. § 890.105(a)(1), (b)(1).   Thereafter, the enrollee may ask OPM to review the carrier's decision within 90 days of the carrier's denial on reconsideration.   *See id.* § 890.105(e)(1)(i).   Only after exhausting these remedies and receiving a final decision from OPM, may the covered individual seek judicial review.   *See id.* § 890.107(c), (d); *id.* § 890.105(a)(1).   A judicial action "[m]ay not be brought later than December 31 of the 3rd year after the year in which

9

the care or service was provided."   *Id.* § 890.107(d)(2).   If an enrollee seeks judicial review of a decision by OPM, the enrollee must file suit against OPM and not the carrier.   *See id.* § 890.107(c).

II.   Failure to Timely Exhaust Administrative Remedies and Jurisdiction

Defendant contends that the Court should grant summary judgment in its favor on Plaintiff's 2008 and 2009 Claims because they were processed on or before May 27, 2009, and Plaintiff's December 10, 2009, request for reconsideration fell outside of the six-month time limit for carrier review.[2]   *See* 5 C.F.R. § 890.105(b).   Plaintiff argues that the regulatory exhaustion requirements contained in Section 890.105 of the Code of Federal Regulations were non-jurisdictional and that a failure to exhaust these administrative remedies may be excused by this Court.   *See, e.g.*, *Gordon v. Office of Personnel Mgmt.*, No. DKC 09–CV-3386, 2011 WL 345902 (D. Md. Feb. 2, 2011) ("[w]here exhaustion requirements are . . . imposed by agency regulation they are non-jurisdictional" and may be excused) (internal quotation marks and citations omitted).   In support of this argument Plaintiff cites cases from other jurisdictions holding that a district court has discretion to excuse non-jurisdictional failure to exhaust where (1) the dispute concerns statutory construction; (2) using administrative procedures would cause irreparable injury; (3) resorting to administrative procedures would be futile; (4) administrative

---

[2]   The parties do not dispute whether Plaintiff exhausted her administrative remedies for her 2008 Claims.   The Court notes, however, that the carrier affirmed its decision on August 12, 2008, and that Plaintiff's December 22, 2008, request for review by OPM therefore seemingly fell outside of the 90-day limit set forth in Section 890.105(e)(1)(i).   Defendant does not raise the issue of the timeliness of Plaintiff's request for OPM review.   Thus, the Court need not consider a timeliness argument and may nonetheless exercise jurisdiction over the claim.   *See Harms v. I.R.S.*, 321 F.3d 1001, 1009 (10th Cir.) (the court has jurisdiction over a case even if a plaintiff fails to timely exhaust administrative remedies because the failure to timely exhaust is not a jurisdictional bar to suit but rather is subject to equitable tolling), *cert. denied*, 540 U.S. 858 (2003).

remedies would be inadequate; or (5) the administrative decision would go unreviewed.  *See id.*
(citations omitted); *see also Avocados Plus v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004).

　　　The Tenth Circuit has rejected the argument that Section 890.105's exhaustion
requirements are non-jurisdictional and instead has concluded that a failure to exhaust these
requirements constitutes a jurisdictional bar to suit.   In *Bryan v. Office of Personnel Management*,
the Tenth Circuit held that the district court did not have jurisdiction over the plaintiff's FEHBA
claim because the plaintiff failed to exhaust her administrative remedies.  *See* 165 F.3d 1315,
1318-19 (10th Cir. 1999).   The *Bryan* court explained that consent is a prerequisite of jurisdiction
and that the government's consent "'defines the terms and conditions upon which it may be sued.'"
*Id.* at 1318 (quoting *Richman v. Straley*, 48 F.3d 1139, 1146 (10th Cir. 1995).   The court
concluded that the plaintiff did not meet the terms defined in the waiver of sovereign immunity
because the plaintiff did not submit a request for reconsideration to the carrier as required by
Section 890.105(c).  *See id.* at 1319 (citation omitted).   The court also explained that even if it
were to construe the plaintiff's requests for information as a request for reconsideration, the
plaintiff also failed to request review by OPM as required by Section 890.105(a)(1).  *See id.*
(citation omitted).   Moreover, because the plaintiff failed to exhaust her administrative remedies,
OPM never reviewed the carrier's calculation of benefits, and thus there was neither the required
"final action" by OPM nor an administrative record for the district court to review.  *See id.*
("courts may only review [OPM's] 'final action on the denial of a health benefits claim'")
(quoting 5 C.F.R. § 890.107(c)) .   Accordingly, the *Bryan* court affirmed the district court's
dismissal of the complaint for lack of jurisdiction because the plaintiff failed to "adhere to the
terms and conditions of the government's waiver of sovereign immunity."  *See id.* at 1319-20.

The *Bryan* court nonetheless recognized three exceptions under which a failure to exhaust administrative remedies could be excused:   (1) if administrative remedies would be futile, (2) when administrative remedies would provide inadequate relief, or (3) when the agency has adopted a policy or practice of general applicability which is contrary to law.   *Id.* at 20 n.4 (citing *Urban v. Jefferson County School Dist.*, 89 F.3d 720, 724 (10th Cir. 1996)). Administrative remedies are futile or inadequate when a plaintiff alleges "'structural or systemic failure and seek[s] system-wide reforms.'"   *Id.* (quoting *Urban*, 89 F.3d at 725) (internal quotation marks and citation omitted); *see also Ass'n for Community Living v. Romer*, 992 F.2d 1040, 1044 (10th Cir. 1993) (citation omitted).

The Court does not believe that any of the exceptions recognized by the Tenth Circuit apply to the facts of this case.   To the extent that Plaintiff argues that the Court should excuse the failure to exhaust because OPM's regulations and administrative procedures constitute an unconstitutional delegation of Congress's legislative authority to OPM, this argument is unavailing.   Plaintiff maintains that OPM's regulation requiring an enrollee to seek judicial review no later than December 31 of the third year after the year in which the care or service was provided instead of within the six-year federal statute of limitations is unconstitutional.   *See* 5 C.F.R. § 890.107(d)(2).   Plaintiff further challenges the constitutionality of OPM's regulation limiting the scope of judicial remedies to include only an order of the court.   *See id.* § 890.107(c) ("[t]he recovery in such a suit shall be limited to a court order directing OPM to require the carrier to pay the amount of benefits in dispute").

Even assuming, for purposes of argument only, that Plaintiff's contentions have merit, the Court does not believe that either the constitutionality of the three-year statute of limitations for *judicial* review or the scope of *judicial* remedies has any relevance to Plaintiff's failure to exhaust

her *administrative* remedies in a timely fashion.   Indeed, the issue regarding the statute of limitations for judicial review is irrelevant to the case at bar because Plaintiff filed her lawsuit within the limitations period prescribed by OPM's regulations.   *See id*.   Moreover, challenges to OPM's regulations establishing a federal statute of limitations and the scope of judicial remedies have nothing to do with the merits of Plaintiff's underlying claim and therefore are in no way relevant to the question whether exhaustion of Plaintiff's administrative remedies should be excused.   Thus, in making this argument Plaintiff has not established that any of the three exceptions to the exhaustion requirements, or the time limits set forth therein, apply.   *Cf. Romer*, 992 F.2d at 1044 ("The plaintiffs must still show that the policy is contrary to law and that the underlying purposes of exhaustion would not be served.") (citation omitted).

Although the *Bryan* court held that a failure to exhaust constitutes a jurisdictional bar to suit, Plaintiff did not wholly fail to exhaust her administrative remedies.   Plaintiff simply failed to *timely* exhaust her remedies.   The Tenth Circuit has held that while a complete failure to exhaust administrative remedies is a jurisdictional bar to filing a civil action, the failure to timely exhaust administrative remedies is not a jurisdictional deficiency but rather is subject to equitable tolling. *See, e.g.*, *Harms v. I.R.S.*, 321 F.3d 1001, 1009 (10th Cir. 2003) (citations omitted).   Plaintiff, however, has not argued that equitable tolling applies to her case.

Even if the Court were to construe Plaintiff's argument that courts have held that a *complete* failure to exhaust is non-jurisdictional (an argument the *Bryan* court rejected) as constituting an argument in support of equitable tolling for a failure to *timely* exhaust, the Court nonetheless would decline to exercise its discretion to toll the statutes of limitation.   Plaintiff has not set forth any argument as to why the Court should excuse her failure to timely exhaust her administrative remedy of seeking reconsideration from the carrier or review from OPM.   She

simply contends that she did appeal (even if untimely) to OPM and that evidence of this appeal is in the administrative record.   *See* Pl's Mot. for Summ. J. at 9.   The Tenth Circuit has warned that the district court "cannot take on the responsibility of serving as [a] litigant's attorney in constructing arguments and searching the record."   *Garett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).   Moreover, the Local Rules of this Court require motions to "state with particularity the grounds and the relief sought," D.N.M.LR-Civ. 7.1(a), and Plaintiff's Motion fails to do this.   Thus, the Court declines to consider whether equitable tolling applies.

For the foregoing reasons, the Court holds that Plaintiff failed to timely exhaust her 2008 and 2009 Claims and that no exception to exhaustion applies.   Accordingly, the Court grants summary judgment in Defendant's favor on Plaintiff's 2008 and 2009 claims.   The Court further holds that Defendant is entitled to summary judgment in its favor on the merits of Plaintiff's 2008 and 2009 Claims for the same reasons that the Court grants Defendant summary judgment on the merits of Plaintiff's 2008 Claims.   *See infra*, §§ IV, V, VI.   Thus, Plaintiff's 2008 and 2009 Claims also are subject to dismissal for this independent reason as well.

III.     Applicability of the APA's Standard of Deferential Review

Defendant argues that the Administrative Procedure Act requires the Court to exercise deference in reviewing OPM's decision denying any further benefits to Plaintiff for her 2008 Claims.   *See* 5 U.S.C. § 706(2)(A) (a district court may set aside an agency action if it is determined to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.").   Plaintiff maintains that the Court should review OPM's decision de novo because the interpretation of the contract provisions at issue here is dictated by the common law and is therefore within the province of the Court.

In *Weight Loss Healthcare Centers of America, Inc. v. Office of Personnel Management*, the Tenth Circuit discussed the applicable standard of review of an OPM decision involving the interpretation of a federal employee's insurance plan.   *See* 655 F.3d 1202, 1205 (10th Cir. 2011). After indicating that the question was a matter of first impression in the Tenth Circuit, the court explained that "an agency's interpretation of a contract is generally not entitled to deference."   *Id.* (citations omitted).   The Tenth Circuit indicated, however, that deference may be appropriate in certain circumstances, and that the following factors can indicate the propriety of deferring to an agency's interpretation under an arbitrary-and-capricious standard of review:   (1) the agency routinely reviews such contracts, (2) review of such contracts is a duty delegated to the agency by Congress, and (3) the contract deals with arcane subject matter or uses specialized terminology with which the agency is familiar.   *See id.* (citations omitted); *see also Northwest Pipeline Corp. v. F.E.R.C.,* 61 F.3d 1479, 1486 (10th Cir. 1995) (deferring to agency's interpretation of natural-gas tariff filed by pipeline company because Congress had delegated broad authority over natural-gas rates to the agency and it had vast experience in reviewing the tariffs); *compare Sternberg v. Dep't of Health & Human Servs.*, 299 F.3d 1201, 1205-06 (10th Cir. 2002) (refusing to defer to agency's interpretation of a sentencing agreement in a criminal case because the agency did not routinely review sentencing agreements, such review was not a duty delegated to the agency by Congress, and the agreement did not concern arcane subject matter).   The Tenth Circuit further explained that "when a contract affects numerous persons throughout the country, fairness and efficiency may suggest the advisability of a central decisionmaker to resolve ambiguities."   *Weight Loss Healthcare*, 655 F.3d at 1205 (citation omitted).

Considering these factors, the *Weight Loss Healthcare* court held that an exception to the general rule requiring de novo review applied.   *See id.* at 1206.   Specifically, the court concluded

15

that "two of the . . . factors argue[d] for deference," because "OPM routinely reviews health-care insurance plans, and it is mandated by Congress to do so." *Id.* In addition, the court explained that "the advantages of a uniform, nationwide interpretation of the[] plans [was] manifest," which also weighed in favor of applying a deferential review. *Id*.

Without citing or distinguishing the Tenth Circuit's controlling decision in *Weight Loss Healthcare*, Plaintiff argues that de novo review is appropriate because Defendant OPM's interpretation of the insurance contract was not based on expertise but rather was premised on general common law principles. In support of this argument, Plaintiff cites the Tenth Circuit case *Jicarilla Apache Tribe v. Federal Energy Regulatory Commission*, 578 F.2d 289, 292-93 (10th Cir. 1978). In *Jicarilla*, the court overturned an agency determination that payment-in-kind of gas royalties under a standard government form contract constituted a "purchase" under the agency's regulations because the "administrative interpretation [wa]s not based on expertise in the particular field . . . but [wa]s based on general common law principles." *Id.* Plaintiff contends that the dispute here, as in *Jicarilla*, is not based upon Defendant OPM's expertise regarding regulatory provisions but rather is premised on general common law contract interpretation, and that the Court therefore should review the Defendant OPM's decision de novo.

Plaintiff fails to acknowledge that the Tenth Circuit already has held that an OPM decision regarding the extent of benefits due under a federal health insurance contract is subject to deference under the APA's arbitrary and capricious standard because the factors indicating the propriety of a deferential review weigh in favor of exercising deference. *See Weight Loss Healthcare*, 655 F.3d at 1206. Because the facts in *Weight Loss Healthcare* are analogous to those here, the same three factors that weighed in favor of deference there support an application of deference here.

Furthermore, the *Weight Loss Healthcare* court explicitly rejected an argument similar to Plaintiff's argument that interpretation of the health insurance contract is not based on agency expertise.   In *Weight Loss Healthcare*, the plaintiff's "sole argument against deference [wa]s that health-insurance contracts do not necessarily involve arcane or technical language."   *Id.*   The Tenth Circuit rejected this argument because it "both (1) understate[d] the complexity of health-care contracts and (2) implicitly overstate[d] the deference due under arbitrary-and-capricious review."   *Id.*   The court reasoned that "contract language need not be arcane to require expertise in its interpretation," for "[e]ven when the language of a paragraph may seem clear in isolation, the interrelationships of provisions can create complications," and "[a] full understanding of such interrelationships can be essential in interpreting a lengthy health-care plan that makes detailed distinctions in many dimensions of coverage."   *Id.* at 1206-07.

Because the Tenth Circuit's decision in *Weight Loss Healthcare* is controlling, the Court rejects Plaintiff's argument that it must review OPM's decision de novo.[3]   Thus, a deferential review under the "arbitrary, capricious, [or] abuse of discretion" standard set forth in the Administrative Procedure Act applies.   *See* 5 U.S.C. §706(2)(A).

IV.    Count I:   Section 8902(m)(2) of FEBHA Requires Full Payment

Count I of the Complaint alleges that Defendant OPM's decision denying full payment of Plaintiff's claims should be reversed because Plaintiff was stationed in a medically underserved area.   Plaintiff contends that under Section 8902(m)(2) of FEHBA, she was entitled to seek medical care outside of her underserved state and that her medical expenses should have been paid in full, without any limitation, by the Plan.

---

[3]   Although de novo review is not appropriate here, the Court notes that even if it were to review OPM's decision de novo, it would grant summary judgment in Defendant's favor for the reasons discussed herein.

Plaintiff did not raise the argument that she was entitled to full payment of her claims because she resided in a medically underserved state in her December 22, 2008, appeal to OPM. Thus, OPM did not address this argument in its final decision.   Generally, "[c]laims not properly raised before an agency are waived, unless the problems underlying the claim are 'obvious,' or otherwise brought to the agency's attention."  *Ark Initiative v. U.S. Forrest Serv.*, 660 F.3d 1256, 1261-62 (10th Cir. 2011).   Thus, in order to satisfy exhaustion requirements, Plaintiff was obligated to present her claims to OPM in sufficient detail to allow the agency to rectify the alleged violation.  *Cf. Forest Guardians v. U.S. Forest Service*, 495 F.3d 1162, 1170 (10th Cir. 2007). Although Plaintiff failed to raise her argument regarding Section 8902(m)(2)'s medically underserved provision, Defendant has not objected to this failure.   Thus, the Court deems any objection waived.[4]  *Cf. Parker v. U.S.*, 448 F.2d 793, 798 (10th Cir. 1971), *cert. denied*, 405 U.S. 989 (1972).

To evaluate Plaintiff's argument that she is entitled to full reimbursement of her claims pursuant to Section 8902(m)(2), the Court must first construe the meaning of the language set forth in Paragraph (1) of Section 8902(m) before construing the exception set forth in Paragraph (2). Paragraph (1) of Section 8902(m) provides, "The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans."   5 U.S.C. § 8902(m)(1).   Pursuant to this

---

[4]   The Tenth Circuit has held that waiver does not apply if a favorable consideration of the issue would defeat jurisdiction.   *See Parker v. U.S.*, 448 F.2d 793, 798 (10th Cir. 1971).   Any objection by Defendant would not defeat this Court's jurisdiction, however, because even in the absence of the non-exhausted claims, the Court would still have jurisdiction over Plaintiff's claim for reimbursement based upon the Plan's catastrophic protection (Count III).

provision, it is the federal government's insurance contract (here, the Plan and the Plan Brochure) that preempts state laws regulating insurance health plans.   *Cf. id.*

Having established the meaning of Paragraph (1), the Court next interprets the meaning of the exception set forth in Paragraph (2).   Section 8902(m)(2) provides,

> Notwithstanding the provisions of paragraph (1) of this subsection, if a contract under this chapter provides for the provision of, the payment for, or the reimbursement of the cost of health services for the care and treatment of any particular health condition, the carrier shall provide, pay, or reimburse up to the limits of its contract for any such health service properly provided by any person licensed under State law to provide such service if such service is provided to an individual covered by such contract in a State where 25 percent or more of the population is located in primary medical care manpower shortage areas designated pursuant to section 332 of the Public Health Service Act.

*Id.* § 8902(m)(2).[5]

The language "Notwithstanding the provisions of paragraph (1) of this subsection" indicates that Paragraph (2) sets forth an exception to the preemption of federal contracts over state law under the limited circumstances described in Paragraph (2).   *Id.* § 8902(m)(2).   Specifically, under those circumstances state law will not be preempted by a federal contract if (1) the contract provides for the payment for a health service for a particular condition, (2) the health service is properly provided by any person licensed under State law to provide the service, and (3) the enrollee is seeking treatment in a state that has been designated as medically underserved.   *See id.* If these three requirements are satisfied, then Paragraph (2) of Section 8902(m) requires the carrier to pay for that service "up to the limits of its contract" even if the federal contract would not otherwise require payment because the service is provided by a category of professional who is not

---

[5]   For 2008 and 2009, the OPM decided that there were fifteen medically underserved states including both New Mexico and Arizona.

covered when providing that service.   *See id.*; 5 C.F.R. § 890.702 (in a medically underserved state, "if a contract between the [OPM] and a[n] . . . insurance carrier . . . provides for payment or reimbursement of the cost of health services for . . . a particular health condition only if such service is rendered by a certain category of practitioner, the plan must also provide benefits, up to the limits of its contract, for the same service when rendered and billed for by any other individual who is licensed under applicable State law to provide such service"); FEHBA Handbook, http://fehb.opm.gov/insure/health/reference/handbook ("If you live in a medically underserved area and are enrolled in a fee-for-service plan, your plan must pay benefits up to its contractual limits, for covered health services provided by any medical practitioner properly licensed under applicable State law.").   Stated differently, Section 8902(m)(2) broadens the scope of coverage in a medically underserved state by expanding the categories of medical professionals who can provide an enrollee with a covered service, thereby benefiting enrollees in underserved states by increasing the number of professionals who can provide enrollees with covered services.

For example, under the terms of the Plan Brochure an enrollee will not receive benefits for physical therapy or x-rays when these services are performed by a chiropractor, even if the state license grants the chiropractor the authority to perform these services.   In a state that is medically underserved, however, the enrollee will receive benefits for physical therapy or x-ray services performed by a chiropractor if the chiropractor's state license authorizes the chiropractor to provide these services.[6]   *See* Exh. 8, p. 42; Exh. 9, p. 48.

Plaintiff's construction of the language in Paragraph (2) to require full payment of her medical claims is contrary to the plain language of the statute in at least two regards.   First,

---

[6]   Enrollees seeking treatment from a professional providing acupuncture services in a medically underserved state may likewise be entitled to expanded coverage for services from this professional.   *See* Exh. 8, p. 46; Exh. 9, p. 49.

nothing in Paragraph (2) alters the contractual language establishing the *amount* the carrier will pay or reimburse enrollees.   To the contrary, Paragraph (2) provides that payment will be made "up to the limits of [the carrier's] contract."   *See* 5 U.S.C. §8902(m)(2).   Plaintiff nonetheless argues that the statute eviscerates the heart of the contract's payment mechanism—*i.e.*, the language providing for the payment of claims based upon whether a physician or hospital is Preferred—simply because a state is medically underserved.   Section 8902(m)(2) does not so provide.   Rather, Paragraph (2) simply expands the categories of covered medical professionals in medically underserved states.   *See id.*   Thus, the language in the federal insurance contract that is superseded by the state licensing law is any language limiting the category of professional who can provide a particular covered service.

When the requirements of Section 8902(m)(2) are broken down, it is clear that the statute is not applicable to the facts at issue here.   Section 8902(m)(2) sets forth an exception to the preemptive effect of a federal insurance contract over a state law and thus necessarily contemplates the existence of both a federal insurance contract and a state law, the latter of which, because of the exception, will not be preempted.   Plaintiff, however, identifies no state licensing law that supersedes the federal contract.   Indeed, on the facts before the Court, Plaintiff identifies no state law of any kind.[7]   Rather, Plaintiff simply claims that the payment limits set forth in the

_____

[7]   Plaintiff's response to Defendant's Motion for Summary Judgment seems to suggest that Plaintiff views the insurance contract as the state law that must be preempted by the FEHBA.   *See* Resp. at 9-10 ("In spite of Congress's clear mandate to provide *uniform* benefits to federal employees, the OPM by its contract provides different benefits in different states").   Such an argument is unavailing.   The language of Section 8902(m)(1) makes clear that it is the "[t]he terms of any *contract* [that] shall supersede and preempt any *State or local law*."   5 U.S.C. § 8902(m)(1).   Thus, it is the federal government's insurance contract (here, the Plan and the Plan Brochure) that preempts inconsistent state laws purporting to regulate insurance health plans; it is not the insurance contract that is preempted by federal law.   *See id.*

contract are inapplicable not because they are superseded by any state law but rather simply because Plaintiff lives in a medically underserved state.

Under such an interpretation, two clauses of Paragraph (2) become superfluous and without effect:   first, the language in the statute establishing the exception to federal preemption—*i.e.*, "Notwithstanding the provisions of paragraph (1) of this subsection"—and, second, the language referring to the state law licensing law—*i.e.*, "for any such health service properly provided by any person licensed under State law to provide such service."   *Cf. id.*   Such a construction violates a fundamental rule of statutory construction.   *See, e.g.*, *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (As a rule, "we construe statutes, where possible, so as to avoid rendering superfluous any parts thereof.") (citation omitted); *accord Marx v. Gen. Revenue Corp.*, 668 F.3d 1147, 1186 (10th Cir. 2011).   Thus, the Court rejects Plaintiff's interpretation of Section 8902(m)(2) as contrary to the plain language of the statute.

Plaintiff's construction of Section 8902(m)(2) is also contrary to the statute for a second, independent reason.   Although Plaintiff interprets the contract language in Paragraph (2) to grant enrollees a blank check to receive unlimited medical services paid in full by the carrier, the language in Paragraph (2) does not support this interpretation.   Rather, Paragraph (2) expressly limits the amount an enrollee may recover to "up to the limits of [the] contract."   *Id.*

The limits of the contract fall short of the full payment Plaintiff seeks in her Complaint. Rather, the payment or reimbursement limits of the contract are determined by the type of provider the enrollee uses.   If the enrollee seeks treatment from a Preferred Provider—*i.e.*, a provider who has agreed to accept a specific negotiated amount as payment in full for covered services—the enrollee will receive PPO Benefits and will only be required to pay out of pocket the coinsurance, copayments, and applicable deductible.   If, however, an enrollee chooses to use a Non-PPO

Provider—*i.e.*, a provider who does not have a contract with the carrier—Non-PPO Benefits apply and the enrollee must pay any difference between the amount the Non-PPO Provider charges and the Plan's allowance for that service, in addition to the applicable coinsurance, copayments, and payment towards the deductible.   Any coverage pursuant to Section 8902(m)(2) must be paid or reimbursed within the foregoing contractual limits.

Plaintiff advances an alternative interpretation of "limits," arguing, without any explanation to support her contention, that the language "up to the limits of the contract" supports full payment of her claim.   Plaintiff maintains that if Congress had wished to limit the coverage of enrollees in medically underserved areas, Congress would have used language such as "subject to the contract."   The Court is not persuaded.

The Merriam-Webster Dictionary defines "limit" as "a prescribed maximum or minimum amount, quantity, or number."   *See* "Limit." *Merriam-Webster Online Dictionary*. 2013. http://www.merriam-webster.com (28 May 2013).   Thus, under the relevant portion of this definition, the language in Section 8902(m)(2) provides that the carrier shall pay or reimburse the enrollee "up to the [prescribed maximum amount] of the contract."   5 U.S.C. §8902(m)(2).   The prescribed maximum of the contract is not the full payment that Plaintiff requests.   Rather, it is payment consistent with the payment provisions set forth in the contract—*i.e.*, payment based upon whether an enrollee uses a Preferred Provider.

Plaintiff's argument for full payment not only is unsupported by the statutory language but also creates an absurd result.   Because there are fifteen states designated by OPM as medically underserved,[8] Plaintiff's interpretation effectively means that in almost one-third of the states

---

[8]   In 2008 and 2009, OPM designated these fifteen states, including New Mexico and Arizona, as medically underserved.

enrollees would receive full and unlimited reimbursement of their medical expenses, with no coinsurance, copayments, or payments towards applicable deductibles, regardless of whether the enrollees choose Preferred Providers.   This is a far greater benefit than the benefit enrollees in the remaining 35 states receive, which, at best, is PPO Benefits.   Plaintiff's interpretation of Section 8902(m)(2) negates the very nature of the fee-for-service plan and any of the contractual limits regarding Preferred Providers, coinsurance, copayments, and payments towards the applicable deductible.   The plain language of the insurance contract does not support this expansive interpretation.

For the foregoing reasons, the Court concludes that Defendant is entitled to judgment as a matter of law in its favor on Count I of the Complaint.   Thus, the Court grants summary judgment in Defendant's favor on Count I.

The Court is not persuaded to hold otherwise by Plaintiff's argument that the Court's construction of Section 8902(m)(2) renders that Section meaningless.   Plaintiff contends that if Section 8902(m)(2) is read to require an enrollee seeking treatment out of state from a Non-PPO Provider to pay the difference between the amount charged and the Plan's allowance, then the statue is "read so that it complies with the plan document," which "renders an act of Congress a nullity."   Mot. for Summ. J. at 5.   The Court disagrees.   As previously discussed, the plain language of Section 8902(m)(2) requires the insurance contract to cover otherwise uncovered services if a state licensing law so provides.   Thus, to the extent a state licensing law authorizes a medical professional, such as a chiropractor, to perform a service that would otherwise be covered under the insurance contract but for the fact that it is performed by a certain category of professional (e.g., a chiropractor), Section 8902(m)(2) alters the contract to require the carrier to provide benefits for that service even if performed by that otherwise uncovered professional.

24

Thus, contrary to Plaintiff's contention, the Court's interpretation of Section 8902(m)(2) does not render Congress's act a nullity.

　　　　To the extent that Plaintiff also argues that Section 8902(m)(2) requires full payment of her medical expenses because there were no providers in the state of New Mexico who were licensed to perform the procedure she required, *see* Resp. at 7, the Court is not persuaded.   No language in Section 8902(m)(2) grants such relief.   Rather, if Plaintiff could not find a provider in New Mexico to perform her surgery, Plaintiff was free to seek treatment anywhere in the United States, and regardless of the state Plaintiff chose, she would be reimbursed under the same procedures as she would be reimbursed in her home state.   Thus, Plaintiff was entitled to locate a Preferred Provider in any state and pay less, or to seek treatment from a Non-PPO Provider, such as the Mayo Clinic AZ, and pay more.   Although Plaintiff argues that the Plan is unworkable because any "federal employee who must leave their [sic] 'area' is . . . responsible for researching over 68 different BC/BS providers dependent on where they [sic] receive treatment to see if their [sic] medical care will be a covered benefit," Resp. at 9, the Court is not persuaded that this task is any more burdensome than an enrollee's obligation to locate a Preferred Provider in her state of residency.   Indeed, regardless of whether an enrollee seeks treatment in her home state or out of state, the enrollee wishing to reduce her costs must consult the Local Plan and determine whether any given professional is a Preferred Provider.

　　　　Finally, the Court does not believe that the reference to the history of OPM's regulations implementing Section 8902(m)(2) lends support for the full reimbursement of Plaintiff's claim. Plaintiff cites an excerpt from this regulatory history discussing a commenter's suggestion that the regulations require the FEHB enrollee to be a resident of, as well as receive treatment in, a medically underserved area in order to receive benefits under that provision.   *See* 45 Fed. Reg.

48098 (1980).   OPM indicated, however, that it was unable to adopt this suggestion because

Section 8902(m)(2) mandates "special consideration" when "'service is provided to an individual

covered by [a] contract in a State' that is medically underserved."   *Id.*   OPM explained that this

statutory language "grants all FEHB enrollees the same access to health care services in designated

medically underserved States, regardless of their personal connection with the area."   *Id.*

Plaintiff argues that she was never given the benefit of the "special consideration"

recognized by OPM in this regulatory history.   This argument is unavailing.   Plaintiff would be

entitled to the "special consideration" mentioned by OPM *if* her claim for benefits were to meet the

requirements of Section 8902(m)(2).   Had Plaintiff sought a particular treatment in Arizona from

a category of medical professional that the Plan did not cover but who was licensed under Arizona

law to provide that particular service, Plaintiff would have been entitled to reimbursement (or

"special consideration") for that care even though she was not a resident of Arizona.   As

previously discussed, Plaintiff has not satisfied these conditions and therefore Section 8902(m)(2)

is inapplicable to Plaintiff's claims.

V.      Count II:   The Plan Brochure is Misleading

Defendant seeks summary judgment in its favor on Count II of the Complaint, in which

Plaintiff alleges that the Plan Brochure is misleading because federal employees are not informed

that there is a "transfer of services" if they seek medical care out of state or that a "new local plan

will be responsible for the plan administration in the medical providers['] state."   Count II further

alleges that Plaintiff was "misled by these omissions as to the type of coverage available to . . . her

should [she] have to go out of [her] area for medical treatment," and that she was unaware that the

transfer of services would result in increased medical costs.   In support of its Motion for

Summary Judgment, Defendant argues that Plaintiff was not "transferred" to a "new" plan and that

26

the Plan Brochure specifically informs enrollees that PPO networks are determined by the Local Plans' contracts with providers in their service areas.

In its appeal to OPM, Plaintiff did not present the argument that the Plan brochure was misleading due to its failure to inform enrollees of a "transfer of services."   Thus, Defendant OPM did not address the argument in its decision upholding the carrier's denial of PPO-Benefits. Defendant, however, has not objected to Plaintiff's failure to exhaust this specific claim, and thus the Court deems any objection waived.  *See supra* p. 18.

Plaintiff's contention that the Plan Brochure does not inform enrollees that there is a "transfer of services" if they seek medical care out of state or that this "transfer" will result in increased medical costs is unsupported by the plain language of the Brochure.   It is undisputed that in 2008 and 2009, Plaintiff was enrolled in the Plan under contract CS 1039 covering all federal employees nationwide who are eligible to enroll in the FEHBA program.   Thus, no transfer to a new plan occurred.   Furthermore, the plain language of the Plan Brochure explicitly describes the role of Local Plans under the nationwide contract.   The Plan Brochure informs enrollees that if they seek medical care in any given state, the Local Plan covering the geographic area in which they seek to receive services will administer their benefits.  *See* Exh. 8, p. 6; Exh. 9, p. 6.   Although Plaintiff implies that the carrier unilaterally transferred her care from New Mexico to Arizona when she chose to seek treatment out of state, the plain language of the contract indicates that the carrier does not initiate any transfer of care or services from one geographic region to the next.   Rather, it is the geographic location in which the *enrollee* chooses to seek services that determines which Local Plan processes and pays the enrollee's claims.  *See* Exh. 8, p. 6 and Exh. 9, p. 6.   Pursuant to the terms of the Plan Brochure, if an enrollee chooses to utilize the services of a provider in her state of residency, then the Local Plan in that state processes and

27

pays her claim.   Similarly, if an enrollee chooses to utilize services outside of her state of residency, then the Local Plan covering that geographic region processes and pays her claim.   The Court concludes that the Plan Brochure is clear that it is the enrollee's choice of provider that determines which Local Plan processes her claim and not a unilateral transfer of care by the carrier.

Moreover, Plaintiff's claim that her selection of an out-of-state carrier somehow increased her out-of-pocket costs or the extent of her benefits is without merit.   If Plaintiff had lived in Arizona instead of New Mexico when she chose to receive services at the Mayo Clinic AZ, her benefits would have been the same.   Regardless of whether an enrollee avails herself of services inside or outside of her state of residency, the controlling factor determining her out-of-pocket costs is whether the provider has a contract with the Local Plan (i.e., is a Preferred Provider).

The Court concludes that the Plan Brochure is not misleading with respect to the extent of an enrollee's out-of-pocket costs.   The plain language of the Brochure informs an enrollee that her medical costs will increase if the enrollee chooses to seek treatment from a professional who is not a Preferred Provider.   *See* Exh. 8, p. 7; Exh. 9, p. 7.   The Plan Brochure also explains that when an enrollee seeks treatment from a Preferred Provider who has contracted with the Local Plan to accept the Plan's allowance as payment in full, the enrollee's out-of-pocket costs will be less.   *See* Exh. 8, p. 6; Exh. 9, p. 6.   Thus, whether the enrollee seeks service out of state is irrelevant to the extent of an enrollee's benefits.

Plaintiff chose to receive services at the Mayo Clinic AZ, which is a Non-PPO Provider for any federal employee enrolled in the Plan, regardless of the employee's state of residency.   For purposes of determining the extent of Plaintiff's benefits, it mattered not that the Mayo Clinic AZ was an out-of-state facility.   The determinative factor was the Mayo Clinic AZ's status as a Non-PPO Provider, which dictated Plaintiff's receipt of Non-PPO Benefits.   If Plaintiff had

28

wanted to receive PPO Benefits, she could have sought care at any PPO Provider nationwide, including but not limited to the Mayo Clinic in Minnesota or the Mayo Clinic in Florida.   Instead, Plaintiff chose the Mayo Clinic AZ.   Plaintiff's benefits are limited by Plaintiff's choice.

For the foregoing reasons, the Court concludes as a matter of law that the contractual language explaining that out-of-pockets costs are greater if an enrollee chooses a Non-PPO Provider is clear and unambiguous and that the Plan Brochure therefore is not misleading.   Thus, the Court grants Defendant's Motion for Summary Judgment on Count II of the Complaint.

The Court is not persuaded to hold otherwise by Plaintiff's argument that the Plan Brochure should be preempted by FEHBA because it treats federal employees with the same coverage differently in different parts of the country.   In Count II, Plaintiff alleges that there are "three major Mayo Clinics in the United States," including the Mayo Clinic AZ in Phoenix, Arizona, the Mayo Clinic in Rochester, Minnesota, and the Mayo Clinic in Jacksonville, Florida, and that had she chosen to receive medical treatment at the Mayo Clinic in Minnesota or Florida the costs would have been significantly lower because Blue Cross/Blue Shield of Minnesota and Blue Cross/Blue Shield of Florida both recognize the Mayo Clinics in their respective areas as Preferred Providers.   Plaintiff argues that denying her PPO-Benefits for treatment at the Mayo Clinic AZ, when she would not be denied these benefits at the Mayo Clinic in Minnesota or Florida, violates the public policy behind Section 8902(m) and Congress's clear mandate to provide uniform benefits to federal employees.

As previously discussed, Section 8902(m)(1) of FEHBA provides that the federal insurance contract shall supersede and preempt state law.   *See* 5 U.S.C. § 8902(m)(1).   Both the legislative history and the title to the amendment adding Section 8902(m)(1) to FEHBA reflect Congress's concern with ensuring nationwide uniformity in the administration of healthcare

29

benefits.  *See Weight Loss Healthcare Centers of Am., Inc. v. Office of Personnel Mgmt.*, 655 F.3d 1202, 1206 (10th Cir. 2011) ("[i]ndeed the title of the law adding § 8902(m)(1) to FEHBA is 'An Act to Amend [FEHBA] to establish uniformity in Federal employee health benefits and coverage by preempting certain State or local laws which are inconsistent with such contracts, and for other purposes'") (citing Pub. L. No. 95–368, 92 Stat. 606 (1978)); *see also* H.R. Rep. No. 95–282, at 4 (1977) ("In view of the doubt and confusion that exists among the health benefits carriers and many States . . . and the necessity and desirability of providing uniform coverage for all enrollees in each option of each plan, the committee strongly recommends enactment of [§ 8902(m)].").   The public policy of uniformity expressed in the legislative history to Section 8902(m), however, does not merit a finding in favor of Plaintiff on her 2008 Claims.

First, there is no differential treatment under the Plan and Plan Brochure.   Although Plaintiff maintains that Defendant's construction of the Plan Brochure results in federal employees with the same coverage being treated differently in different parts of the country, this characterization is inaccurate.   All federal employees, whether they reside in New Mexico, Arizona, Minnesota, or Florida (or any other state), are subject to the same rules regarding PPO Benefits and Non-PPO Benefits, and therefore all federal employees receive the same coverage at any given facility.   Thus, for example, a federal employee who lives in Florida but receives treatment at the Mayo Clinic AZ would receive Non-PPO Benefits with respect to that treatment, just as Plaintiff, who resides in New Mexico, received Non-PPO Benefits for treatment at that facility.   Conversely, a federal employee who lives in New Mexico but receives treatment at the Mayo Clinic in Minnesota or Florida would receive PPO Benefits at those facilities just as a resident of Minnesota or Florida would receive PPO Benefits at those same facilities.

The error in Plaintiff's reasoning occurs because Plaintiff compares apples and oranges. Plaintiff contends that she paid the same rate in New Mexico as a federal employee in Minnesota would pay, but that the "'benefits' are not paid at the same rate" because she received Non-PPO Benefits at the Mayo Clinic AZ whereas a Minnesota resident would receive PPO Benefits at the Mayo Clinic in Minnesota.   The Mayo Clinic AZ, however, is a different facility from the Mayo Clinic in Minnesota, and thus Plaintiff's argument of differential treatment does not withstand scrutiny.

Second, Plaintiff misunderstands the policy concern with uniformity expressed in the legislative history to Section 8902(m)(1).   Congress was concerned that the application of state law could be expected not only to increase premium costs to the government and enrollees, but also would lead to a lack of uniformity of benefits resulting in enrollees in some states paying a premium based, in part, on the cost of benefits provided only to enrollees in other states.   *See* H.R. Rep. No. 282, 95th Cong. 1, at 1, 4 (1977).   Thus Congress enacted Section 8902(m)(1), which ensures uniformity nationwide by making the federal insurance contract supreme.   In making her argument regarding uniformity, however, Plaintiff assumes that FEHBA preempts the federal insurance contract.   Plaintiff argues that this preemption should occur because the Plan Brochure treats federal employees with the same coverage differently in different parts of the country.   As previously discussed, however, it is the federal insurance contract that supersedes state law and not the insurance contract that is preempted by the federal law FEHBA.   *See* 5 U.S.C. § 8902(m)(1). Plaintiff's argument regarding uniformity therefore fails to persuade the Court to grant summary judgment in her favor on Count II of the Complaint.[9]

---

[9]   Nor is the Court persuaded by Plaintiff's argument that the Plan is complex and should be construed in favor of Plaintiff.   This rule of construction applies only if the contract language is

VI.   <u>Count III:   The Catastrophic Coverage Protection Applies</u>

Plaintiff alleges in Count III that the catastrophic coverage provision of the Plan is dishonest, leading enrollees to believe that all expenses in excess of $6,500.00 are covered. Plaintiff contends that she has no adequate remedy at law and that BCBSAZ should be ordered to pay all of her medical expenses above the catastrophic threshold.   Defendant maintains that the Plan Brochure is clear, that the catastrophic protections have limits, and that under those limits the carrier paid Plaintiff's claims properly.

The catastrophic protection in the 2008 Plan Brochure provides, "If the total amount of out-of-pocket expenses in a calendar year . . . , coinsurance, and copayments (other than those listed below) exceeds $6,500 under Standard Option, . . . then you . . . will not have to continue paying the for the remainder of the calendar year."   Exh 8, p. 21.   The catastrophic protection, however, further provides in relevant part that

> **The following expenses are not included** under this feature. These expenses do not count toward your catastrophic protection out-of-pocket maximum, and you must continue to pay them even after your expenses exceed the limits described above[:]
>
> - The difference between the Plan allowance and the billed amount. . . . ;
> - Under Standard Option, your 30% coinsurance for inpatient care in a Non-member hospital;
> - Under Standard Option, your 30% coinsurance for outpatient care by a Non-member facility[.]

---

ambiguous.   *See, e.g.*, *Western Heritage Ins. v. Chava Trucking, Inc.*, 991 F.2d 651, 654 (10th Cir. 1993) ("The court can construe an insurance policy only where the language of the policy is equivocal, indefinite, or ambiguous.") (citation omitted).   Because the Court concludes that the plain language of the contract is clear, the Court need not construe the Plan in Plaintiff's favor but rather must enforce the contract as written.   *Cf. id.* ("Where the contract is unambiguous . . . the court is bound to enforce the terms of the policy.") (citation omitted).

*Id.*   The catastrophic coverage provisions in the 2009 Plan Brochure are primarily the same, with the following change from 2008:   "The catastrophic out-of-pocket maximum for deductibles, coinsurance, and copayments is now . . . $7,000 per year" instead of the 2008 maximum of $6,500 per year.   Exh. 9, p. 10.

Although Plaintiff argues that she met the catastrophic limit of $6,500 with respect to her claims from the Mayo Clinic AZ and that the carrier therefore was required to pay her claims in full, Plaintiff's contention ignores the exclusions applicable to the catastrophic coverage. Specifically, because the Mayo Clinic AZ was not a Preferred Provider, the Plan Brochure excludes from the protection the difference between the Plan's allowance for Plaintiff's covered services and the amount the Mayo Clinic AZ charged for those services; the Plan Brochure also excludes Plaintiff's 30% coinsurance for inpatient care at the Mayo Clinic AZ.   *See* Exh. 8, p. 21; Exh. 9, p. 10.

In OPM's decision affirming the carrier's denial of PPO Benefits for Plaintiff's 2008 Claims, OPM rejected Plaintiff's argument regarding the catastrophic protection precisely because the difference between the Plan allowance and the billed amount as well as the 30% coinsurance for inpatient care in a hospital that is not Preferred are excluded.   *See* Appendix at 1 ("Ms. Porta, in your letter you state you met the $6,500.00 catastrophic amount in May and all subsequent expenses should have been covered in full.   According to page 20, *the following expenses are not included under this feature.   These expenses do not count toward your catastrophic protection out-of-pocket maximum, and you must continue to pay them even after your expenses exceed the [$6,500] limit.*).   OPM then concluded that the Plan had "paid the claim at the highest benefit level possible" for Non-PPO Providers.   *See id.*   This decision was not arbitrary, capricious, or an abuse of discretion, but rather was rationally connected to the facts of the case.   Indeed, even if

33

the Court were reviewing OPM's decision de novo, the Court would reject Plaintiff's interpretation of the catastrophic protection.   Accordingly, the Court grants Defendant's Motion for Summary Judgment on Count III of the Complaint.

Plaintiff's argument that the "catastrophic provision simply ceases to exist for the standard option employee after all the exclusions are added up" does not persuade the Court to reach a different result.   A reading of the plain language of the catastrophic provision in conjunction with the Plan Brochure in its entirety indicates that the provision has meaning and that that meaning results in standard option enrollees receiving greater protection than they would in the absence of the provision.[10]   Indeed, as OPM's decision letter indicates, Plaintiff benefitted from this greater protection because several of her laboratory claims were paid at 100% of the Plan's allowance because her catastrophic limit was met.   *See id.* ("Upon reprocessing, some of the claims were paid at 100% of the allowance due to the catastrophic maximum being met."); *see also* Aug. 12, 2008, letter from BCBSAZ deciding Plaintiff's appeal ("Claim 08081515403300 also did not apply any coinsurance amounts due to meeting your catastrophic protection maximum for 2008 on other processed claims."); Explanation of Denial Rep., [Doc. 18-1, p. 30] at 13 ("Also, the lab services on claims 05Y5403200, 0908151 5403100060815154032QQ 040815l5403200 were . . . reprocessed, and they were paid at 100% of the plan allowance since the member's catastrophic amount had been previously met").   Thus, Plaintiff's argument does not persuade the Court to grant summary judgment in her favor on Count III of the Complaint.

---

[10]   Because the contract language is clear and unambiguous, the Court declines Plaintiff's invitation to construe the Plan Brochure in her favor.   *See supra* note 9.

## **CONCLUSION**

For the foregoing reasons, IT THEREFORE IS ORDERED that Plaintiff's Motion for

Summary Judgment and Brief [Doc. 21] is hereby DENIED and that Defendant's Motion for

Summary Judgment and Supporting Memorandum [Doc. 22] is hereby GRANTED.


Dated this 24th day of September 2013.


_____

MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE